IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| _____ ) | | |
| MARILOU YUSON DUMAPIAS | ) | |
| | ) | |
| versus | ) | Case No. 1:20cv297 RDA/TCB |
| | ) | |
| JAMES B. HAYBYRNE *et al.* | ) | |
| _____) | | |

# DEFENDANT JAMES B. HAYBYRNE'S ANSWER
# TO COUNTS IV, V, AND VIII OF THE COMPLAINT
# AND HIS AFFIRMATIVE DEFENSES

Defendant James B. Haybyrne answers herein Counts IV, V, and VIII of the Complaint filed against him by Plaintiff Marilou Yuson Dumapias.  Mr. Haybyrne has separately moved pursuant to Fed. R. Civ. P. Rule 12(b)(6) to dismiss Counts I-III, VI-VII, and IX-X of the Complaint and therefore is not required to answer those Counts at this time.  Defendant Penny Lii Haybyrne has moved pursuant to Fed. R. Civ. P. Rule 12(b)(6) to dismiss all 10 counts against her.

# ANSWER

1.     This action is brought under the Trafficking Victims Protection Reauthorization Act of 2003 (the "TVPRA") and other state and federal laws to seek just compensation for a victim of human trafficking and unfair employment practices, Marilou Dumapias.

ANSWER:

This paragraph is solely an introduction.  No answer is required.

2.     Defendants James Haybyrne ("Mr. Haybyrne") and Penny Lii Haybyrne (aka Lii Sheau Ping) ("Mrs. Haybyrne") (together, "Defendants" or "the Haybyrnes") deceived Ms. Dumapias into coming to the United States from Hong Kong as a domestic worker with the promise of adequate pay, reasonable hours, humane treatment, and being provided food free of charge. She received none of these things. Instead, the Haybyrnes forced her to work grueling hours in inhumane conditions and gave her only a fraction of the compensation and food to which she was entitled. This mistreatment has had lasting physical and psychological impacts on Ms. Dumapias.

ANSWER:

The allegations of this Paragraph are denied.

3.     Human trafficking affects victims, like Ms. Dumapias, who are forced, defrauded, or coerced into labor exploitation. Domestic workers who come to the United States on special visas, including B-1 visas like Ms. Dumapias's, are especially vulnerable. This is a pervasive problem; according to Human Rights Watch, "The special visa programs for domestic workers are conducive to and facilitate the violation of the workers' human rights." Human Rights Watch, *Hidden in the Home: Abuse of Domestic Workers with Special Visas in the United States* (2001), *available at* https://www.hrw.org/reports/2001/usadom/usadom0501.pdf. While Ms. Dumapias's case stands on its own facts, the reports of organizations like Human Rights Watch establishes the importance of the protections provided by the TVPRA.

ANSWER:

The allegations of this Paragraph are denied as they relate to Plaintiff.  The allegations in the third, fourth, and (most of fifth) sentences are general statements about federal law— no answer is required to these allegations.

2

4.      Ms. Dumapias brings this civil action under the TVPRA (which establishes a private cause of action for trafficking victims like Ms. Dumapias), the Fair Labor Standards Act of 1938 (the "FLSA"), the Virginia Minimum Wage Act, Virginia statutory labor and employment law, and state common law. By this Complaint, Ms. Dumapias seeks redress for egregious violations of her basic human rights.

ANSWER:

The first sentence of this Paragraph only identifies the claims, and no answer is required.  The allegations in the second sentence are denied.

## JURISDICTION AND VENUE

5.      Jurisdiction over the subject matter of this action is established under 28 U.S.C. § 1331, the TVPRA, 18 U.S.C. § 1589 *et. seq.*, and the FLSA, 29 U.S.C. § 201Hum *et. seq.*

ANSWER:

This Paragraph states only a legal conclusion for which no answer is required.

6.      This Court has supplemental jurisdiction over the related state law claims asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. § 1367. Supplemental jurisdiction over those claims exists because they arise from the same common nucleus of operative facts from which the federal claims arise.

ANSWER:

This Paragraph states only a legal conclusion for which no answer is required.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District. In particular, the

Plaintiff's employment with the Defendants, and the abuse she suffered at their hands, took place in Alexandria, Virginia.

ANSWER:

The assertion of venue is not contested.   The allegations regarding "employment with the Defendants" and the claims of abuse are denied.

## PARTIES

8.      Plaintiff Marilou Dumapias is, and at all relevant times was, a citizen of the Philippines. She resided in the Haybyrnes' home in Alexandria, Virginia approximately from the time of her arrival in the United States on December 17, 2017, through January 17, 2018, and then again approximately from May 8, 2018, until July 24, 2018. At other times, she resided in the Haybyrnes' home in Hong Kong. Since July 24, 2018, Ms. Dumapias has depended upon the generosity of acquaintances to live free of charge at various locations in Fairfax, Virginia.

ANSWER:

It is admitted that Plaintiff is a citizen of the Philippines.

It is admitted that Plaintiff resided in the Haybyrnes' Hong Kong home from approximately October 2016 to December 16, 2017, and that Plaintiff resided in Mr.  Haybyrnes' Alexandria home from approximately December 17, 2017 to January 17, 2018.

It is admitted that Plaintiff resided in the Haybyrnes' Hong Kong home from approximately January 18, 2018 until May 8, 2018.,

Defendant admits that Plaintiff reside in the Alexandria house from approximately from May 8, 2018, until July 23, 2018.

Defendant is without information regarding where Plaintiff has resided since July 23, 2018, and therefore this allegation is denied.

Pursuant to Ms. Dumapias' B-1 visa, which expired in December 2018, and her Philippines passport, which expired in March 2020, once she left Mr.. Haybyrne's employ,  she had to leave the United States.  If she is still in the United, then mostly likely she is here illegally.

9.      Upon information and belief, Defendant James Haybyrne is a citizen of the United States. At all relevant times, he resided at 712 Prince Street, Alexandria, Virginia 22314.

ANSWER:

It is admitted that James Haybyrne is a citizen of the United States.  He is Permanent Resident of Hong Kong, and his primary residence is in Hong Kong.

Defendant denies the allegations in the last sentence of this paragraph.

10.      Upon information and belief, Defendant Penny Lii Haybyrne (aka Lii Sheau Ping) is a citizen of Taiwan. At all relevant times, she resided at 712 Prince Street, Alexandria, Virginia 22314.

ANSWER:

It is admitted that Penny Lii Haybyrne is a citizen of the Republic of Chinas (Taiwan). She is Permanent Resident of Hong Kong, and her primary residence is in Hong Kong.

Defendant denies the allegations in the last sentence of this paragraph.

## **FACTUAL ALLEGATIONS**

### **A.      Defendants Trafficked Ms. Dumapias to the United States.**

#### **1.      Ms. Dumapias started working for the Haybyrnes in Hong Kong in 2016.**

11.      Ms. Dumapias was born on June 22, 1966 in Valencia, Philippines. She is the single mother of one daughter, and has worked to support her daughter ever since she was born.

ANSWER:

It is admitted that Plaintiff is from the Philippines, and presumably she is a citizen of the Philippines. Ms. Dumapais is approximately 54 years old.

Defendant is without information regarding the remaining allegations of this Paragraph, and therefore those allegations are denied.

12. Before coming to the United States, Ms. Dumapias had worked as a domestic worker with various families in the Philippines, Singapore, and Hong Kong. Ms. Dumapias was connected to the Haybyrnes through an employment agency in Hong Kong in 2016.

ANSWER:

Defendant admits that Plaintiff represented to the Hong Kong Employment Agency that she worked previously as a Domestic Worker in Singapore and Hong Kong. Defendant further admits the first Hong Kong Employment Contract with Plaintiff was signed in October 2016 working through the Employment Agency in Hong Kong.

Defendant is without information regarding the remaining allegations of this Paragraph, and therefore those allegations are denied.

13. On August 17, 2016, Ms. Dumapias signed a two-year employment contract to work for the Haybyrnes in Hong Kong (the "HK Contract"). The HK Contract did not state that Ms. Dumapias would be working for the Haybyrnes in the United States, nor was she told that when she was first hired. Ms. Dumapias started work for the Haybyrnes in their seaside apartment in Hong Kong in October 2016.

ANSWER:

Defendant admits that Plaintiff signed a 2-year written Employment Contract in August 2016 to work as a Domestic Worker. The terms of this written contract are self-evident. Defendant admits that at the time this first Hong Kong Employment Contract was signed there were no discussions regarding travel to the United States.

6

Defendant is without information regarding the remaining allegations of this Paragraph, and therefore those allegations are denied.

14.     Pursuant to the HK Contract, Ms. Dumapias was paid a monthly salary of HKD $4,210 (equivalent to about USD $537) and a monthly food allowance of HKD $995 (equivalent to about USD $126). Ms. Dumapias had an account with Hang Seng Bank in Hong Kong, into which the Haybyrnes directly deposited her salary and food allowance.

ANSWER:

Defendant admits that pursuant to the terms of the first Hong Kong Employment Contract Plaintiff was paid a monthly salary and food allowance.  In compliance with Hong Kong labor laws, the contract monthly salary was $HK 4210 and the monthly food allowance was $HK 995.

Defendant admits that the contract salary and food allowance payments were deposited directly into Plaintiff's Hang Seng Bank account.

15.     Although Ms. Dumapias was able to buy her own food while working for the Haybyrnes in Hong Kong, she was rarely given time to prepare or eat her food, and was strictly prohibited from eating the food she prepared for the Haybyrnes.

ANSWER:

Defendant admits that Plaintiff was able to purchase food in Hong Kong.

Defendant denies the remaining allegations of this Paragraph.

16.     In or about February 2017, the Haybyrnes hired an additional woman as a live-in housekeeper in their Hong Kong apartment, which somewhat reduced the burden on Ms. Dumapias when she worked for the Haybyrnes in Hong Kong.

ANSWER:

Defendant admits that in mid-2017 they hired Anna Marie de Castro as a second Domestic Worker to assist them in Hong Kong.

Defendant denies the remaining allegations of this Paragraph.

### 2.      The Haybyrnes caused Ms. Dumapias to come to the United States under false pretenses.

17.   After working for the Haybyrnes for about a year, the Haybyrnes asked Ms. Dumapias to join them in the United States to continue her work. This surprised Ms. Dumapias, who was not aware she might have to go to the United States when she initially took the job. Ms. Dumapias preferred not to travel to the United States. However, she feared that if she did not agree, she would be fired or would have to quit before the end of the HK Contract, which would damage her reputation and put future employment opportunities through hiring agencies at risk.

ANSWER:

Defendant admits that in the fall of 2017 he asked Plaintiff whether she would be willing to accompany Mr. Haybyrne and his wife to the United States for one or two limited stays in the United States.

Defendant is without knowledge whether Plaintiff was surprised by discussions of travel to the United States.  Mr. Haybyrne had been diagnosed with Stage 4 lung cancer, and he would be treated in part in the United States.

Defendant is without information regarding what Plaintiff thought or feared, and therefore denies the remaining allegations of this Paragraph.

18.     The Haybyrnes' other housekeeper, with whom Ms. Dumapias split her duties, was to stay back in Hong Kong. The two remained in contact, however, and Ms. Dumapias frequently shared her experiences in the United States with this housekeeper.

ANSWER:

Defendant admits that Ms. deCastro, the second Domestic Worker in Hong Kong, remained in the Haybyrnes' employ in Hong Kong (she later returned to the Philippines).  At the end of her Hong Kong Employment Contract, Ms. De Castro returned to the Philippines

Defendant is aware that Plaintiff and Ms. de Castro texted extensively (as many as 1100 texts) and that they talked by phone from time to time.  Defendant had provided Plaintiff with an ASUS smartphone and a Verizon account.  Plaintiff used this phone/account for much, if not all, of her contacts with Ms. de Castro (at least through July 23, 2018). Plaintiff had her own smartphone with a T-Mobile account and likely used that device for other texting and calling.

19.     The Haybyrnes prepared a United States employment contract (the "U.S. Contract"), which Mr. Haybyrne and Ms. Dumapias signed on November 28, 2017. The U.S. Contract stated that Ms. Dumapias would work 40 hours per week, be paid USD $10.50 per hour, and be provided food free of charge, among other terms.

ANSWER:

Defendant admits that Mr. Haybyrne signed the U.S. Employment Contract with Plaintiff late-November 2017. The terms of the U.S Employment Contract are self-evident.

Defendant denies that he prepared the U.S Employment Contract.  Plaintiff was responsible for her application for a United States visa, and it was Plaintiff who . submitted the U.S. Employment Contract  to the U.S. Consulate in Hong Kong as part of her B-1 Visa application.

Defendant denies the remaining allegations of this Paragraph.

20.     On or about December 13, 2017, Ms. Dumapias went to the United States Consulate to turn in paperwork related to her B-1 visa application. A consular official there

explained to Ms. Dumapias the terms of the U.S. Contract, confirming her understanding that her housing and food would be free of charge and that she would be paid USD $10.50 per hour.

ANSWER:

Defendant admits that Plaintiff submitted her application for a B-1 Visa to the U.S. Consulate in Hong Kong.  Defendant's understanding is that Plaintiff's application was twice denied before eventual approval.

Defendant admits that a consular official likely questioned Plaintiff about parts of her application.

The terms of the written U.S. Employment Contract are self-evident.

Defendant denies the remaining allegations of this Paragraph.


21.     After securing her B-1 visa (as the "Personal or Domestic Employee of U.S. Citizen Haybyrne, James Brendan"), Ms. Dumapias traveled to the United States, arriving on or about December 17, 2017. She worked for the Haybyrnes in their Alexandria, Virginia home until January 17, 2018. She then traveled back to Hong Kong with the Haybyrnes and continued to work for them there. She returned to the United States to join the Haybyrnes on May 8, 2018, and again worked for the Haybyrnes until July 24, 2018, when she left the Haybyrnes.

ANSWER:

Defendant admits Plaintiff's application for a B-1 Visa was eventually approved by the U.S Consulate in Hong Kong, and that Plaintiff traveled to the United States arriving on or about December 17, 2017.

Under the B-1 Visa, Plaintiff could be in the United States only in the employ of Mr. Haybyrne. Plaintiff worked in Alexandria as a live-in Domestic worker for Mr. Haybyrne for 4½ weeks, for December 17, 2017 to January 17, 2018. When the Haybyrnes returned to Hong Kong in mid-January 2018, Plaintiff also traveled back to Hong Kong.

Defendant admits that four months later, in May 2018, Mr. and Mrs. Haybyrne  traveled from Hong Kong back to the United States where Mr. Haybyrnes' medical recovery from Stage 4 lung cancer under the doctors at Sibley/Johns Hopkins Hospital continued.

Plaintiff traveled to the United States arriving several days ahead of the Haybyrnes (whose flight to Dulles Airport was diverted to New York because of bad weather). Plaintiff opened the Haybyrnes' Alexandria house. The Haybyrnes arrived two days later.

Defendant admits that Plaintiff worked in Alexandria from approximately May 8, 2018 to July 23, 2018 as a live-in Domestic Worker for Mr. Haybyrne.  Mrs. Haybyrne, who has her own international business, was in Europe and Hong Kong for nearly all of June 2018 and into July 2018.

Defendant denies the remaining allegations of this Paragraph.

22.    The U.S. Contract was in effect during both periods that Ms. Dumapias worked for the Haybyrnes in the United States. But, little did Ms. Dumapias or the United States. consular officials know at the time she entered the U.S. Contract, that the Haybyrnes would never follow it.

ANSWER:

Defendant admits that the U.S. Employment Contract between Mr. Haybyrne and Plaintiff was in effect for the two stays in the United States.

Defendant denies  the remaining allegations of this Paragraph.

**B.    The Haybyrnes Forced Ms. Dumapias to Work Excessive Hours.**

**1.    The Haybyrnes lived in a four-story historic mansion.**

23.    Ms. Dumapias arrived in the United States to find that the Haybyrnes have an extravagant, four-story mansion in the heart of Old Town Alexandria. The historic house—well known in the area as the Swann-Daingerfield House—has been home to prominent figures in history and serves as a neighborhood landmark. The house is approximately 9,500 square-feet.

ANSWER:

Defendant admits that an LLC (712 Prince Street 1 LLC) controlled by Mr. Haybyrne owns an historic house in Old Town Alexandria. The City of Alexandria's real estate records show that the property is a 3-floor plus ground floor condominium of approximately 5,464 total square feet.

Defendant denies the remaining allegations of this Paragraph.

2.      **Ms. Dumapias was forced to work excessive hours, with almost no breaks, tirelessly waiting on the Haybyrnes and maintaining their mansion.**

24.     With apparently little regard for the amount of work involved in tending to a house of this size by herself, the Haybyrnes told Ms. Dumapias that in working for them in the United States, she would have all the same responsibilities she had in maintaining their Hong Kong apartment. However, the equivalent duties in the United States amounted to a much greater workload. In Hong Kong, the Haybyrnes lived in an apartment, and Ms. Dumapias shared her cleaning, cooking, and other duties there with another live-in housekeeper. In the United States, Ms. Dumapias was charged with meticulously cleaning and maintaining a 9,500-square-foot mansion—in addition to other duties that included cooking, preparing for holiday parties and other social gatherings in the home, and shopping for home supplies—by herself. To say that Ms. Dumapias's workload increased significantly from her workload in Hong Kong can hardly capture the scope and difficulty of what the Haybyrnes demanded of her in the United States. But even ignoring the increased workload, the simple fact is that the hours she was required to work vastly exceeded the amount agreed upon in the U.S. Contract.

ANSWER:

Defendant admits that Plaintiff work duties as a live-in Domestic Worker while in the United States included general house cleaning, 1-2 times weekly household grocery shopping (that included Plaintiff buying food for herself), and preparation of meals for the Haybyrnes (in the May-July time period this was mostly Mr. Haybyrne only, as Mrs.

Haybyrne was away for much of this time traveling on business). Plaintiff also did laundry and some gardening on a weekly basis.

Defendant denies the remaining allegations of this Paragraph.

25.     The U.S. Contract provided that Ms. Dumapias would work 40 hours per week (8 hours per day). The U.S. Contract also provided that Ms. Dumapias would be entitled to weekly rest days, statutory holidays, two days paid leave, and two days paid sick leave for each two month service period. In addition, the U.S. Contract stated that the Haybyrnes could not require Ms. Dumapias to remain on the premises after working hours without compensation.

ANSWER:

The terms of the U.S. Employment Contract are self-evident.

Defendant denies the remaining allegations of this Paragraph.

26.     In reality, Ms. Dumapias was made to work extremely long hours, well more than the 8 hours per day provided for in the contract, six days per week. On some occasions, she was expected to work on her one day off.

ANSWER:

Defendant denies the allegations of this Paragraph.

27.     During the work day, she prepared breakfast, lunch, and dinner for the Haybyrnes when they ate at home; did laundry; ironed and folded clothes; cleaned all the floors and windows; changed bedsheets; tended to indoor and outdoor plants and cut flowers (a particularly demanding task given the many vases distributed throughout all areas of the house); cleaned the backyard and the porch; took out the garbage; cleaned the cars; and went shopping for groceries.

ANSWER:

Defendant admits that Plaintiff's work duties as a Domestic Worker while in the United States included general house cleaning, 1-2 times weekly grocery shopping, and preparation of meals for the Haybyrnes (in the May-July time period this was mostly Mr. Haybyrne only, and only 2-3 times a week, and Mrs. Haybyrne was away traveling on business).  Plaintiff also did laundry and some gardening on a weekly basis.

Defendant denies the remaining allegations of this Paragraph.

28.     The Haybyrnes unreasonably required Ms. Dumapias to perform many of these tasks on a daily basis. For example, Ms. Dumapias was required to clean every room in the mansion on a daily basis, even though not all of them were necessarily used each day.

ANSWER:

Defendant denies the allegations of this Paragraph.

29.     The Haybyrnes imposed other restrictions that also diminished Ms. Dumapias's quality of life. The only time Ms. Dumapias left the house for a non-work-related reason was on Sundays to visit a Filipino church she joined in June 2018. The Haybyrnes told her not to talk to strangers without their permission. They imposed a curfew on Sundays, Ms. Dumapias's only day off each week. She was not allowed to turn the house alarm on or off without the Haybyrnes' permission, even when they were out of town.

ANSWER:

Defendant admits that Plaintiff's work responsibilities required her to travel within the City of Alexandria, mostly to the Harris Teeter market on St. Asaph's Street, for her regular grocery shopping.

Defendant admits that Plaintiff had her own complete set of keys to the Alexandria house, and that she was instructed on how to use the alarm system.

Defendant admits also that Plaintiff initially attended a local Alexandria church, but by early June 2018 she had joined a Filipino church, the Jesus is Lord Church in Rockville, Maryland.  Plaintiff regularly attended services and functions at her church.

Defendant denies  the remaining allegations of this Paragraph.


30.     At times, the unreasonable conditions and restrictions imposed on her became more akin to imprisonment. For example, at one point the Haybyrnes took a several-day trip to New York and left Ms. Dumapias in the house with the alarm on. Ms. Dumapias was thus trapped in the house, unable to even go to the backyard, until the Haybyrnes responded to her request to turn the alarm off remotely. One day that weekend, Ms. Dumapias texted Mrs. Haybyrne multiple times over the span of hours to ask if she could turn off the alarm to go water the plants outside. Mrs. Haybyrne finally responded by telling Ms. Dumapias to wait, and only turned off the alarm several hours later.

ANSWER:

Defendant admits that he and Mrs. Haybyrne took a 3-day trip to New York City in mid-July 2018.  Plaintiff remained in Alexandria.

Plaintiff has her own set of keys to the Alexandria house and had been instructed on how to use the Alexandria house alarm system.

Defendant admits that Plaintiff contacted them while they were in New York asking about the alarm system, and that Mrs. Haybyrne responded. .

Defendant denies the remaining allegations of this Paragraph.

31.     Ms. Dumapias did not want to continue working for the Haybyrnes, but felt constructively imprisoned by them. She was in a foreign country, had no family or friends, did not have access to food or money, and did not have the resources to improve her conditions. Statements from the Haybyrnes that she must either accept her situation without complaint or leave came across to Ms. Dumapias as overt threats. She knew that if she complained, she would be fired; but if she left, her reputation would be damaged and this would undermine any chances at future employment. Indeed, on July 21 she texted the Haybyrnes' housekeeper in Hong Kong that she believed that she needed to endure her situation or else she would never be paid.

ANSWER:

Defendant admits Plaintiff had come to the United States on a B-1 Visa, the terms of which are self-evident and which were explained to her by U.S. Consulate officials in Hong Kong.

As a condition of the B-1 Visa, Mr. Haybyrne as the sponsor had to provide room and board and a prepaid return ticket for Plaintiff to Hong Kong.  Mr. Haybyrne provided Plaintiff with a private, furnished apartment in the Alexandria house, and from time to time with cash (not part of her wages) for her personal shopping and local travel. He also purchased the required return airline ticket for Plaintiff; Plaintiff kept her passport and the ticket confirmation in her possession.

Defendant admits that Plaintiff signed a second Hong Kong Employment Contract to begin in November 2018 when the first contract was to expire by its own terms.

Defendant is without information as to what Plaintiff was thinking, and therefore denies all allegations regarding her thoughts or concerns.

Defendant denies the remaining allegations of this Paragraph.

C.      **The Haybyrnes grossly underpaid Ms. Dumapias.**

32.     During the period that she worked tirelessly cleaning a multimillion-dollar,

9,500-square-foot historic mansion, cooking and shopping for its owners, and performing

myriad other daily tasks, the Haybyrnes paid Ms. Dumapias almost nothing.

ANSWER:

Defendant admits that Plaintiff was paid consistent with the terms of the first Hong
Kong Contract and the terms of the U.S. Employment Contract. Salary and allowance
payments were regularly deposited in Plaintiff's Hang Seng bank account; Plaintiff, who
apparently did not maintain a bank account in the United States, requested the direct
deposits in her Hang Seng bank account in Hong Kong.  Direct deposit was either
required or strongly encouraged under the terms for the B-1 visa.

Defendant admits that when on July 18, 2018, only days before her disappearance,
Plaintiff requested for the first time a cash payment. Plaintiff was then paid $500 US
cash, for which Plaintiff signed a receipt acknowledging payment and receipt.

Defendant denies the remaining allegations of this Paragraph.


33.     Any money that the Haybyrnes did pay her, which was significantly less than what

she was owed under the U.S. Contract, was paid into her Hong Kong-based Hang Seng bank

account (except for a single cash payment only days before Ms. Dumapias left them in July

2018). When Ms. Dumapias went to the ATM at the Fairfax, Virginia branch of HSBC bank,

which is affiliated with Hang Seng Bank, on one of her rare days off, she was unable to use

the ATM with her Hang Seng debit card. (This is because she had never accessed her account

online and did not know it was possible to change the status of her account to set up

international withdrawals.) Alone in a foreign country, Ms. Dumapias did not know how to

access her finances or who she could speak to about it. Indeed, the Haybyrnes had

specifically instructed her not to talk to strangers without their permission. Even if she had

been able to access her account, the Haybyrnes had only deposited a small fraction of what they owed her under the U.S. Contract.

ANSWER:

Defendant admits that Plaintiff was paid consistent with the terms of the first Hong Kong Contract and with the terms of the U.S. Employment Contract.  Salary and allowance payments were regularly deposited in Plaintiff's Hang Seng bank account .

Defendant admits that when on July 18, 2018, only days before her disappearance, Plaintiff requested for the first time a cash payment.  Plaintiff was then paid $500 US cash, for which Plaintiff signed a receipt acknowledging payment and receipt.

Defendant is without information as to whether Ms. Dumapias went to an HSBC branch, and without information as to whether she was able to access her Hang Seng account, and therefore denies the allegations in the second and third sentence of the above Paragraph.

Defendant denies  the remaining allegations of this Paragraph.


34.      Even after Ms. Dumapias informed the Haybyrnes that she had tried unsuccessfully to access her Hang Seng account in the United States, the Haybyrnes did not offer to help her gain access to her funds or to pay her in another way. After Ms. Dumapias's first stint in the United States, the Haybyrnes deposited HKD $14,582.30 (equivalent to about USD $1,860) in Ms. Dumapias's Hang Seng bank account. This amount was purported to include wages for her work in the United States from December 2017 through January 2018. Because Ms. Dumapias worked in the United States from very early in the morning until very late at night, six days a week, the amount deposited did not account for all the hours she worked, and thus fell short of what she was owed under the U.S. Contract.

ANSWER:

Defendant denies that Plaintiff told him that "she had tried unsuccessfully to access her Hang Seng account in the United States."

Defendant admits that regular deposits were made to Plaintiff's Hang Seng Bank account.

Defendant denies the remaining allegations of this Paragraph.

35.     In June 2018, during Ms. Dumapias's second stint in the United States, the Haybyrnes deposited two payments of HKD $5,205 (equivalent to about USD $664) into Ms. Dumapias's Hang Seng bank account in Hong Kong. Because, as Ms. Dumapias told the Haybyrnes, she could not access the funds in that account from the United States, and these deposits were only a fraction of what she was owned, they did not satisfy the Haybyrnes' obligations under the U.S. Contract.

ANSWER:

Defendant denies that Plaintiff told him that she could not access her Hang Seng bank account from the United States.

Defendant admits that Plaintiff was fully paid pursuant to the terms of the first Hong Kong Contract and the terms of the U.S. Employment Contract.

Defendant denies the remaining allegations of this Paragraph.

36.     On or about July 18, 2018, Mrs. Haybyrne gave Ms. Dumapias USD $500 in cash and instructed her not to tell people she had no money. This was the first time the Haybyrnes had paid Ms. Dumapias in the United States with money she could access.

ANSWER:

Defendant admits that on or about July 18, 2018 Plaintiff requested that she be paid part of her wages in cash, and that Plaintiff was then paid $500 US in cash. Plaintiff signed a receipt acknowledging that the cash payment was part of the contract salary.

Defendant denies that this was the first time Plaintiff was paid or given cash -- from time to time Mr. Haybyrne gave Plaintiff $40-$60 cash, and when Plaintiff did the grocery shopping she was at times given cash in excess of the grocery costs. These payments

were not salary or wage payments, but cash gifts that Plaintiff could use in any way she chose. Defendant did not monitor Plaintiff's household grocery purchases.

Defendant denies the remaining allegations of this Paragraph.

### D. The Haybyrnes did not provide Ms. Dumapias with food, making her already arduous work almost unbearable.

37.     The most egregious and inhumane breach of the U.S. Contract, however, was that the Haybyrnes provided no food for Ms. Dumapias and made clear that she was not permitted to eat the food she prepared for them. These problems were compounded by the fact that they provided no money with which should buy her own food and they knew that she had no access to funds.

ANSWER:

Defendant denies the allegations of this Paragraph.

38.     Unlike in Hong Kong, the Haybyrnes did not give Ms. Dumapias a food allowance in the United States. Just as in Hong Kong, Ms. Dumapias was not provided her own food and was not allowed eat the food she prepared for the Haybyrnes. As a result, Ms. Dumapias went hungry. One of her very few reliefs from hunger was during her first stint working in the United States, when the Haybyrnes hosted a number of holiday parties and other social gatherings and Ms. Dumapias was able to eat leftover food while cleaning up without the Haybyrnes noticing.

ANSWER:

Defendant admits that Plaintiff was paid an amount equal to her Hong Kong salary and food allowance during the two United States visits.

Defendant admits that part of Plaintiff's work responsibilities was to do the regular grocery shopping for the household and to prepared certain meals.  Nether Defendant nor Mrs. Haybyrne monitored the grocery purchases made by Plaintiff.

Defendant also admits that Plaintiff's Alexandria apartment has its own refrigerator, and the apartment has direct access to the house kitchen where Plaintiff did her meal preparations.

Defendant admits that from time to time he and Mrs. Haybyrne entertained in the Alexandria house, and often there were leftovers from the entertaining.

Defendant denies the remaining allegations of this Paragraph.


39.     Otherwise, during her stints in the United States, Ms. Dumapias generally would eat once a day. For this meal, she would usually discretely eat some of the rice she prepared for the Haybyrnes. Sometimes she was able to add some of the sauce that went with their meals. Because she knew the Haybyrnes did not want her eating their food, she would eat as quickly as possible—and often in the backyard, her room, or a bathroom. Even so, there were several days in which Ms. Dumapias could combat her hunger with nothing but hot water.

ANSWER:

Defendant is without information regarding how frequently Plaintiff ate, and therefore denies those allegations.

Defendant admits that Plaintiff, who did the household grocery shopping and prepared many of the household meals as part of her work responsibilities, had access to food.

Defendant denies the remaining allegations of this Paragraph.


40.     That Ms. Dumapias did not starve to death is probably attributable to a few sources of nutrition that she relied on: the holiday leftovers, described above; canned food that she brought with her from Hong Kong for her second stint in the United States, but that soon

21

ran out; sneaking rice and sauce from the Haybyrnes' meals, as described above; and, as discussed below, food ultimately provided to her by members of the church that she joined.

ANSWER:

Defendant admits that Plaintiff at least one time returned from her Rockville, Maryland church with one or more bags of groceries.

Defendant denies the remaining allegations of this Paragraph.

41.     Members of Ms. Dumapias's church observed Ms. Dumapias looking thin and weak from starvation. After being asked if she was all right, Ms. Dumapias told other church members that she had no food and no money to buy food. Members of her church then started giving her food to take home. Ms. Dumapias depended on this food and learned to ration the food whenever she received it. But Ms. Dumapias had to hide the food from the Haybyrnes— indeed, Mrs. Haybyrne once scolded Ms. Dumapias after seeing her with some groceries from a churchmate.

ANSWER:

Defendant admits that Plaintiff at least one time returned from her Rockville, Maryland church with one or more bags groceries.

Defendant denies the remaining allegations of this Paragraph.

**E.      Starving, exhausted, and scared, Ms. Dumapias finally escaped her situation on July 24, 2018.**

42.      By the summer of 2018, starvation combined with the excessive daily labor increasingly affected Ms. Dumapias's health and appearance. She experienced dizziness, headaches, weakness, stomach pains, and abnormal bowel movements. Before she came to

22

the United States in May, she weighed about 103 pounds. By July, Ms. Dumapias had lost

almost ten pounds, a significant amount of weight for her 4'11" frame.

ANSWER:

Defendant denies the allegations of "starvation combined with excessive daily labor" in
the above Paragraph.

Defendant is without information regarding Plaintiff's claimed physical and mental
health issues, and therefore denies those allegations.

Defendant is without information regarding Plaintiff's personal weight and claimed
weight losses (except that an earlier physical report in Hong Kong when Plaintiff
started her work for the Haybyrnes identified Plaintiff's weight at 99 lbs.), and
therefore denies those allegations.

43.      While Ms. Dumapias initially hoped to be able to endure working for the

Haybyrnes, by late July her physical health was greatly deteriorated, and she grew

increasingly mentally and emotionally distressed. On July 18, 2018, Ms. Dumapias texted the

housekeeper in Hong Kong that she almost fainted from hunger and that the Haybyrnes did

not allow her to buy food for herself. She texted a churchmate to pray for her because the

Haybyrnes were mistreating her. She even texted Mr. Haybyrne himself to tell him he was not

treating her well.

ANSWER:

Defendant is without information regarding Plaintiff's claimed physical and mental
health issue, and therefore denies those allegations.

Defendant denies the allegations of this Paragraph.

44.     Her entire situation had become so dire that she started to become afraid for her security. She no longer felt safe with the Haybyrnes, and on July 24, 2018, Ms. Dumapias realized that she had no choice but to leave their "employ."

ANSWER:

Defendant denies the allegations of this Paragraph.

45.     When the Haybyrnes were both out of the house that day, Ms. Dumapias called a churchmate and told her she was not safe and that she needed to leave immediately before her employers came back. The churchmate quickly arranged for a friend to pick Ms. Dumapias up from the Haybyrnes' home. Ms. Dumapias hurriedly packed her belongings into a garbage bag and the churchmate's friend picked her up and took her to the churchmate's house.

ANSWER:

Defendant admits that on July 23, 2018 Plaintiff disappeared leaving his employ.

Defendant is without information regarding Plaintiff's alleged calls to churchmates (except for calls made on the ASUS phone leading up to the day of Plaintiff's disappearance), and therefore he denies these allegations

Defendant denies the remaining allegations of this Paragraph.

F.     **After Ms. Dumapias Escaped her Situation, the Haybyrnes Tried to Return Her to Their Service Through Threats and Coercion.**

46.     After Ms. Dumapias escaped, the Haybyrnes contacted people from her church that they believed knew her, including the pastor, and made statements to them designed to intimidate Ms. Dumapias by putting her in fear of U.S. immigration authorities. Mr. Haybyrne

told the pastor that he had reported Ms. Dumapias to the police and to immigration authorities

in the United States and Hong Kong. He told the pastor that Ms. Dumapias had "abandoned

me and my family to live illegally in the USA," that she was "not free to remain in the United

States" now that she had managed to flee her dire circumstances, and that "her visa has been

canceled." He added that Ms. Dumapias's "singular purpose here in the United States was to

take care of her employer" and asked for help in locating her.

ANSWER:

Defendant admits that after he discovered Plaintiff's disappearance, he tried to find her
by calling and texting the ASUS/Verizon smartphone that had been provided to her.
Fearing that Plaintiff might have been kidnapped, he contacted the Alexandria Police
Department, and the APD sent an officer to the Alexandria house.

Mr. Haybyrne also tried to contact the Pastor at Plaintiff's Rockville, Maryland church.
The Pastor did not respond.

Defendant denies  the remaining allegations of this Paragraph.


47.     Mr. Haybyrne also threatened Ms. Dumapias directly to try to scare her into

coming back to her life of involuntary servitude. The night she left, he texted her: "I found

something in your room that I had to turn over to the police. You can't have that in your

possession as it is illegal. See you tomorrow!" Ms. Dumapias does not know what he was

referring to; she had left behind nothing but some leftover food from her churchmates and

some pictures.

ANSWER:

Defendant admits that he attempted to contact Plaintiff.  He denies that he
threatened her.

Defendant admits that Plaintiff did not respond to his calls and texts.

Defendant denies the remaining allegations of this Paragraph.

48.     In one last attempt to persuade her to return to her traffickers, Mr. Haybyrne, conceding that he severely underpaid Ms. Dumapias, offered Ms. Dumapias USD $15,000. He emailed her: "I have your USD $15,000. Let me know where I should send it." Ms. Dumapias never replied to this email because she was afraid that her reply would lead the Haybyrnes to her.

ANSWER:

Defendant admits that Mr. Haybyrne sent text messages trying to contact Plaintiff. Defendant denies the remaining allegations of this Paragraph.


49.     As recently as August 2019, the Haybyrnes' attorney, acting as their agent, also threatened to report Ms. Dumapias to local law enforcement and federal authorities; he informed Ms. Dumapias's counsel that "We are passing along the information we gather to the police, and the information will be shared also with the U.S. immigration authorities."

ANSWER:

Defendant denies that he or the Haybyrnes' attorney threatened Plaintiff. Defendant denies the remaining allegations of this Paragraph.


**G.      The Haybyrnes' Inhumane Treatment Caused Ms. Dumapias Lasting Physical and Emotional Damage.**

50.     Ms. Dumapias's starvation at the hands of the Haybyrnes has had lasting physical consequences. She has suffered from physical abnormalities in her abdomen, ongoing stomach pain, abnormal stomach sounds, and the inability to digest food property. On July 30, 2018, one week after she left the Haybyrnes, Ms. Dumapias went to an urgent care facility due

to her stomach problems. The doctor who examined Ms. Dumapias found abnormalities during her physical exam and was concerned about her low weight. The doctor also prescribed medicine to ' treat Ms. Dumapias's stomach problems. However, Ms. Dumapias was unable to get recommended bloodwork done because she did not have enough money to pay for medical care.

> ANSWER:
>
> Defendant is without information regarding Plaintiff's claimed physical and mental health issues, and therefore denies these allegations.

51.    Ms. Dumapias's stomach problems stemming from her mistreatment by the Haybyrnes continue to this day. Her starvation still affects her appetite and ability to digest food properly, and she still has abnormalities in her bowel movements.

> ANSWER:
>
> Defendant is without information regarding Plaintiff's claimed physical and mental health issues, and therefore denies these allegations.

52.    Additionally, Ms. Dumapias's ordeal caused her lasting post traumatic psychological damage. The starvation, excessive and grueling work schedule, and frequent psychological abuse by the Haybyrnes has had such a lasting impact on Ms. Dumapias that she cannot discuss her trauma without intense emotional and even physical reactions. Ms. Dumapias is also plagued by frequent headaches and has trouble sleeping.

> ANSWER:
>
> Defendant is without information regarding Plaintiff's claimed physical and mental health issues, and therefore denies these allegations.

27

**H.**     **To This Date, the Haybyrnes Have Not Paid Ms. Dumapias Anything Close to What She Is Owed Under the U.S. Contract.**

53.     The Haybyrnes still have not adequately compensated Ms. Dumapias under the U.S. Contract.

ANSWER:

Defendant denies the allegations of this Paragraph.

54.     On August 29, 2019, after Ms. Dumapias (through counsel) demanded that the Haybyrnes pay her she was owed under the U.S. Contract, the Haybyrnes deposited HKD $21,914 (equivalent to USD $2,796) into Ms. Dumapias's Hang Seng bank account. But even this payment constitutes a small portion of what Ms. Dumapias is owed and is significantly less than the USD $15,000 Mr. Haybyrne previously stated was owed to her. The Haybyrnes still owe Ms. Dumapias several thousand dollars in salary.

ANSWER:

Defendant admits that after attempting to contact Plaintiff with no success, and after requesting unsuccessfully the details of Plaintiff's wage claim, he calculated the sum due Plaintiff (without any setoffs for Plaintiff's breach of contract, the emergency locksmith charges, her taking ASUS smartphone, and more) and deposited that sum in Plaintiff's Hang Seng Bank account.

Defendant denies the remaining allegations of this Paragraph.

55.     The Haybyrnes' abusive conduct and ongoing refusal to pay Ms. Dumapias what she is owed under the U.S. Contract continues to make life exceedingly difficult for Ms. Dumapias. She came to the United States with almost nothing, relying entirely on the reasonable expectation that she would be paid for her work. Instead, she was starved and underpaid. Ms.

Dumapias finally escaped from the Haybyrnes and now lives with members of her church. Ms.

Dumapias currently depends on the generosity of her churchmates for both food and shelter.

ANSWER:

Defendant denies the allegations in the first sentence of this Paragraph.

Defendant admits that Plaintiff came to the United States under a B-1 Visa, which was approved in part based on the U.S. Contract signed by both Mr. Haybyrne and Plaintiff.

Defendant admits that he fully complied with the terms of the U.S. Employment Contract.

Defendant is without information as to where or with whom Plaintiff has resided since she left the employment in July 2018, and therefore he denies the allegations in the third, fourth, and fifth sentences of this Paragraph.

If Plaintiff is indeed still in the United States, then mostly likely she is illegally here. Individuals who knowingly are sheltering an illegal alien are themselves in violation of the federal laws.

Defendant denies the remaining allegations of this Paragraph.

### FOURTH CLAIM FOR RELIEF

### Fair Labor Standards Act of 1938

### Federal Minimum Wage

### 29 U.S.C. §§ 206, 207, 216(b)

75.     Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

ANSWER:

Defendant repeats his answers as set forth above in response to Paragraphs 1-55.

76.     Ms. Dumapias and the Haybyrnes were in a United States-based employment relationship within the meaning contemplated by 29 U.S.C. Section 203(d)-(g) from November 28, 2017 until around July 24, 2018.

ANSWER:

Defendant admits the U.S. Employment Contract between Mr. Haybyrne and Plaintiff, the terms of which are self-evident.  Mrs. Haybyrne is plainly not a party to the U.S. Employment Contract, and under the terms of Plaintiff's B-1 visa only Mr. Haybyrne could be her employer.

Defendant also admits that Plaintiff worked for Mr. Haybyrne in the United States from December 17, 2017 to January 17, 2018, and again from approximately May 9, 2018 to July 23, 2018.

Defendant denies the remaining allegations of this Paragraph,

77.     29 U.S.C. Section 206(a) provides that "[e]very employer shall pay to each of his employees" the federal minimum wage, and Section 206(f) provides that "Any employee (1) who in any workweek is employed in domestic service in a household shall be paid wages at a rate not less than the [the federal minimum wage] . . . ."

ANSWER:

This Paragraph states only the language of a federal statute.  No answer is required.

78.     The federal minimum wage during all relevant times was $7.25 per hour.

ANSWER:

Defendant admits.

79.     The Haybyrnes willfully and knowingly failed to pay Ms. Dumapias the statutory minimum wage for her services in violation of 29 U.S.C. Section 206.

ANSWER:

Defendant denies the allegations of this Paragraph.


80.     Pursuant to 29 U.S.C. Section 216(b), Ms. Dumapias is entitled to recover the amount of her unpaid minimum wages, and an additional equal amount as liquidated damages, attorneys' fees, and costs.

ANSWER:

Defendant denies the allegations of this Paragraph.


## FIFTH CLAIM FOR RELIEF

### Virginia Minimum Wage Act
### Va. Code Ann. §§ 40.1-28.10, 40.1-28.12

81.     Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

ANSWER:

Defendant repeats his answers as set forth above in response to Paragraphs 1-55.


82.     The Virginia Minimum Wage Act, Va. Code. Ann. § 40.1-28.10, provides:

"Every employer shall pay to each of his employees' wages at a rate not less than the

federal minimum wage and a training wage as prescribed by the U.S. Fair Labor

Standards Act (29 U.S.C. § 201 *et seq.*)."

    ANSWER:

    This Paragraph states only the language of a state statute. No answer is required.


    83.    As set forth above, the Haybyrnes willfully and knowingly failed to pay

Ms. Dumapias the statutory minimum wage for her services in violation of the FLSA.

    ANSWER:

    Defendant denies the allegations of this Paragraph.


    84.    Pursuant to Va. Code Ann. § 40.1-28.12, Ms. Dumapias is entitled to recover

the amount of her unpaid minimum wages, plus interest at eight per centum per annum upon

such unpaid wages, interest from the date or dates said wages were due, and reasonable

attorneys' fees.

    ANSWER:

    The Virginia Minimum Wage Act does not apply to domestic service workers in private

homes.

    Defendant denies the allegations of this Paragraph.

**EIGTHTH CLAIM FOR RELIEF**

**Breach of Contract**

95.     Plaintiff restates and incorporates Paragraphs 1 through 55 of the Complaint as if fully stated herein.

ANSWER:

Defendant repeats his answers as set forth above in response to Paragraphs 1-55.


96.     The United States employment contract between the Haybyrnes and Ms. Dumapias, which the United States Consulate relied on in approving Ms. Dumapias's B-1 visa application, stated that Ms. Dumapias would work 40 hours per week, be paid USD $10.50 per hour, and be provided all food free of charge.

ANSWER:

Defendant admits the U.S. Employment Contract between Mr. Haybyrne and Plaintiff, the terms of which are self-evident.  Defendant also admits that a written employment contract was required for Plaintiff's B-1 visa.

Defendant denies the remaining allegations of this Paragraph.


97.     The Haybyrnes breached their contractual obligations by not paying Ms. Dumapias USD $10.50 per hour for the work she performed, not providing her with food or a food allowance, and subjecting Ms. Dumapias to grueling and inhumane working hours far beyond 40 hours per week.

ANSWER:

Defendant denies the allegations of this Paragraph.

98.     As a result of the Haybyrnes' conduct, Ms. Dumapias has suffered damages in an amount to be determined at trial.

ANSWER:

Defendant denies the allegations of this Paragraph.

## AFFIRMATIVE DEFENSES

1.     The Complaint fails to sufficiently state claims upon which relief may be granted.

2.     Defendant has fully paid Plaintiff any sums potentially due as claimed in Counts IV, V, and VIII.

3.     Plaintiff failed to mitigate her damages, if any.

4.     Defendant is due setoff and recoupment for Plaintiff's breach of the U.S. Employment Contract, for Plaintiff's taking the Alexandria house keys with her when she disappeared which required emergency locksmith services, and for Plaintiff's taking the ASUS smartphone provided by Mr. Haybyrne with her when she disappeared.

5.     Plaintiff's Count IV claim under the Fair Labor Standards Act is in part (any claim for December 2017/January 2018) barred by the applicable two-year statute of limitations.

6.     Plaintiff's Count V claim under the Virginia Minimum Wage Act is barred because the statute does not apply to domestic service workers in private homes.

Defendant James B. Haybyrne denies that Plaintiff is due any relief, and he prays that the Court deny all of Plaintiff's claims and award him costs, including statutory costs, and any other such relief as this Court deems just and proper.

Respectfully submitted,

**JAMES B. HAYBYRNE**

By Counsel

_____/s/ James S. Kurz_____
James S. Kurz (VSB #16610)
REDMON PEYTON & BRASWELL LLP
510 King Street, Suite 301
Alexandria, VA 22314
(703) 684-2000
JKurz@RPB-law.com

## CERTIFICATE OF SERVICE

I certify that a true copy of this ANSWER and AFFIRMATIVE DEFENSES of

Defendant James B. Haybyrne was served on May 27, 2020 by the ECF system which is valid

service on all counsel of record.

_____/s/ James S. Kurz_____
James S. Kurz (VSB #16610)
REDMON PEYTON & BRASWELL LLP
510 King Street, Suite 301
Alexandria, VA 22314
(703) 684-2000
JKurz@RPB-law.com